# IN THE COURT OF APPEALS OF IOWA

No. 24-1105
Filed October 15, 2025

**GENESIS EQUITIES, LLC,**
        Plaintiff/Counterclaim Defendant-Appellee,

**vs.**

**MELISSA ANNE DUFFIELD and VOLLEYFROG IOWA, LLC,**
        Defendants/Counterclaim Plaintiffs and Third-Party Plaintiffs/Counterclaim Defendants-Appellants,

**vs.**

**ABODE CONSTRUCTION, INC., LUXAIR AVIATION, LLC, JEFFREY WITTER and HANNAH KUSTES,**
        Third-Party Defendants/Counterclaim Plaintiffs-Appellees.
_____

Appeal from the Iowa District Court for Linn County, Valerie L. Clay, Judge.

The lessees in a lease-contract dispute and clients in a construction-contract dispute appeal from the district court ruling concluding they materially breached the relevant contracts first and owed the lessor $52,788.74 plus its attorney fees and the contractor $199,681.96 plus accrued interest. **AFFIRMED.**

Angela Campbell (argued) of Dickey, Campbell & Sahag Law Firm, PLC, Des Moines, for appellants.

Philip A. Burian (argued) and Matthew L. Roth of Simmons Perrine Moyer Bergman PLC, Cedar Rapids, for appellees.

Heard at oral argument by Tabor, C.J., and Greer and Buller, JJ.

**GREER, Judge.**

Melissa Duffield dreamed of creating a volleyball oasis in Iowa. With the goal of making that dream a reality, she formed a corporation[1] and entered lease and construction contracts. After the deal between these parties went bad, the district court determined that Duffield materially breached both contracts. Duffield appeals the district court ruling. Giving weight where it is due with the district court's factual findings, we find the district court analysis to be accurate and affirm its decision.

**I. Background Facts and Proceedings.**

Duffield had a history of playing volleyball, both as a young athlete and at the collegiate level, and she coached and was involved with several different college volleyball programs before moving back to her hometown of Cedar Rapids. Because of her experiences, Duffield had the goal of building a state-of-the-art sand volleyball facility near her hometown. To achieve that dream, in 2017, Duffield was the general contractor and construction manager for a multi-million dollar indoor/outdoor sports facility. But that business arrangement soured in fall 2017.[2]

In January 2018, a mutual acquaintance introduced Duffield to Jeffrey Witter, a land developer with more than forty years of experience. Witter has developed over a thousand individual lots and maintains a strong relationship with the City of Marion. He and his daughter, Hannah Kustes, own and have

---

[1] We refer to Duffield and that corporation collectively as "Duffield" going forward.
[2] This also resulted in litigation, which was ongoing as of the April 2023 trial in this case.

management positions in Genesis Equities, LLC (Genesis), a real estate investment company; LuxAir Aviation, LLC (LuxAir), an airport operations entity for the Marion Airport; and Abode Construction, Inc. (Abode), a commercial contractor and developer.[3]

Duffield wanted to build a facility that could compete against her former business venture, so Witter drove Duffield around to various properties, including land near the Marion Airport that Witter and Kustes were planning to eventually develop (the Marion AirCom Park). At that point, the land near the Marion Airport was still one large parcel—platting, infrastructure engineering, and city approvals had not yet begun, which Witter told Duffield. He also told Duffield that if she leased the land, she could either use his commercial contractor company, Abode, or complete the work herself.

Almost immediately, Duffield and Witter began communicating regularly about Duffield's plan. Duffield told Witter she had a maximum of about $250,000 cash to put into the project and would be seeking investors, sponsors, and financing. The two exchanged concept drawings while Witter continued to inquire whether Duffield was having any luck with additional funding.

Sometime around March, Duffield created a project proposal projecting completion in four phases. She estimated she would need $350,000 to complete phase 1, which included nineteen outdoor sand courts with lights, a fully fenced in

---

[3] Other family members also have roles in these businesses, but they were not made parties to the case in their individual capacities and did not testify at trial. Although the precise structure of each business and the role of each family member is unclear, what's important—and undisputed—is that Witter and Kustes each played hands-on roles.

area, a tiki hut, fountain koi pond, and concessions. Buildings with indoor courts and a possible restaurant were not contemplated until phases 2 through 4. On March 12, Duffield sent Witter an updated drawing, which detailed the layout of the facility, including nineteen outdoor courts, portable restrooms, and water rinse stations.

At the same time, Witter was moving forward on plans for the entire Marion AirCom Park development. An engineering firm created a concept plan for the subdivision, which estimated the layout for Duffield's business, Oasis Sandbar and Volleyball.[4] It also showed that an existing pond, which Duffield wanted to make into a decorative water feature, would be converted into a wet detention basin.

On March 19, Kustes sent Duffield a letter of intent for a commercial lease with Genesis[5] and another for a construction contract with Abode. Along with terms related to the length of the lease and the lease payments, the Genesis letter of intent outlined the intended used was "Outdoor Sand Volleyball Facility with Parking and Vendor Concessions." It also offered an option to purchase. The tenant occupancy date was to be determined "following completion of construction," but they agreed to work toward an occupancy date of April 2018. The letter of intent also outlined that sewer and other city services were not yet at the property; Genesis would work with the local utilities to bring them to the property but "[t]enant understands that sewer and other city services may[ ]be

---

[4] This business venture is called many different names throughout the record.
[5] Although Duffield initially entered the lease with LuxAir as the lessor, LuxAir transferred ownership of the land and assigned the lease to Genesis in October 2018. For simplicity, we refer to Genesis as the lessor throughout—even before the transfer and assignment took place.

delayed due to timing and may require temporary services be used for a period of no more than 1 year." Duffield signed this letter of intent on March 23.

The Abode letter of intent stated that Abode would provide "site construction permitting and reporting, labor, materials, [and] equipment" for the scope of work, which was expected to include "19 outdoor sand volleyball courts, fences, patios, paved facility entrance/vendor concessions area, private and public utility connections within the site, and gravel parking." Abode would have the scope of work substantially completed as soon as possible, with the goal of providing at least temporary use facilities for occupancy in April. Abode would be paid a fee equal to 10% over total costs of the project, and it warned that some immediate expenses would be incurred—for things related to site design and project approvals, which Duffield would be responsible for even if the project failed. Duffield also signed this letter of intent on March 23.[6]

Duffield sent both letters of intent to her attorney[7], who was representing her in the litigation surrounding the indoor/outdoor sports facility in Cedar Rapids. He told her he does not practice in commercial transactions but advised her "maybe you should walk away from it." The attorney was worried about Duffield because her business plan seemed unsustainable. He knew from personal experience that construction projects, especially those involving dirt work, "have a

---

[6] Duffield signed both letters of intent in her own name, doing business as Oasis Sandbar and Volleyball.

[7] While this project was being developed, Duffield engaged three different firms to represent her and had a fourth lawyer, who represented Duffield in other litigation, review the letters of intent. Deposition testimony from three of the attorneys representing Duffield was offered at trial after the district court found that she had partially waived the attorney-client privilege with those attorneys by making their advice an issue in the case.

knack" for going over budget. He believed she did not have sufficient funding for the project, and he was concerned that Duffield's venture would be trying to compete with local volleyball facilities already in operation. Duffield did not heed the attorney's advice.

Witter began moving dirt for Duffield's project in anticipation of the signed contracts; he knew that she wanted to be operational in April for the volleyball season, and it was already late March. Meanwhile, Kustes was working on creating formal contracts for Genesis and Abode, and Duffield continued setting up future events and trying to obtain financing. Then, on March 28, the engineers rendered a preliminary plat—the first step toward formalizing legal property boundaries. The approximately seven acres contemplated by the letters of intent and subsequent leases became "Lot 2."[8]

Hannah emailed Duffield both contracts on April 11. In spite of the date they were sent, the lease agreement for Lot 2 stated it began on April 1, 2018 and expired on March 30, 2034. It required Genesis, as lessor,

> at its sole cost and expense, procure and perform all work and materials necessary to bring the site to rough grade in preparation for Lessee's work and provide at a minimum a gravel access drive to service the Premises along with coordination of applicable electric and water utility service installation.

While Duffield, as lessee, was required to,

> at [her] sole cost and expense[,] construct all site improvements as needed for Lessee's intended use, furnish and install the signage, furniture, and equipment necessary to conduct Lessee's business in

---

[8] The northern boundary of Lot 2 was farther north than it had been on the concept plan finished a few weeks earlier. The concept plan had underestimated the area of seven acres. The new lot line crossed through an existing pond, which Duffield did not realize until several months later.

[its] entirety . . . . Lessee's Work shall comprise the improvements upon the Leased Premises from the rough grade building pad.

The lease contemplated that the rent would be $18,000 for the first year and then $85,000 for years two through sixteen. It was Genesis's obligation to "keep any private common area facilities and drives in good order and serviceable condition," while Duffield was required to pay a pro-rata share of the costs Genesis incurred in maintaining and repairing those common areas. In section 7, "Utilities," the lease stated:

> As of the Delivery Date, Lessor will cause the Leased Premises to be serviced, on a temporary basis at minimum, with electric and water utilities sufficient to meet Lessee's requirements as set forth in the *Exhibit B*, during Lessee's performance and pursuit of Lessee's Work. Prior to May 1st, 2019, Lessor shall provide at minimum temporary sewer service to service the premises. Lessee shall pay all utility expenses that are separately metered or billed to the Leased Premises. Lessor shall not be liable for any damages incurred on account of the utility company's failure at any time to supply the utilities.

In section 18, the lease listed several "events of default" that applied to the lessees only, including the following:

> A. Lessee's failure to pay any installment of Base Rent or Additional Rent or delinquency charges when due or any payment with respect to operating expenses or any other payment or reimbursement to Lessor required under this Lease and such payment is not made within ten (10) days after Lessee received written notice of such failure from Lessor on more than two (2) occasions in any consecutive twelve (12) month period.
> . . . .
> C. Lessee becoming insolvent, making a transfer in fraud of creditors or an assignment for the benefit of creditors and the assignment is not dismissed within 30 days.
> . . . .
> F. Lessee failing to comply with any term, provision or covenant of this Lease other than subparagraph A of this paragraph 18 and the Lessee not curing such failure within thirty (30) days after Lessor provides written notice of such default to the Lessee, provided however, where the nature of such default is such

that it cannot be reasonably cured within said thirty (30) day period, Lessee shall not be deemed to be in default if Lessee commences to cure within said thirty (30) day period, thereafter diligently pursues such cure to completion.

As Duffield requested and as contemplated in the letter of intent, the lease also provided the option for her to purchase Lot 2 for an initial purchase price of $914,760 in year one (from April 1, 2018 until March 30, 2019) and then at future prices that were reduced by the partial value of her rent payments.[9]  The lease stated it "contain[ed] the entire understanding and agreement of the parties."  But when Kustes sent it to Duffield, it did not contain any attached exhibits that the lease itself contemplated.  Kustes later testified she sent Duffield the document expecting it to be a draft—not the final lease document.  Knowing Duffield was represented by counsel, Kustes thought they would come back with requests for changes.  But on April 23, Duffield returned the signed lease as it was, handwriting in some information and then attaching an outdated site plan[10] as "Exhibit A Site

---

[9] As the lease contract put it:

> Thereafter the initial purchase price value shall be used to calculate a reduced purchase price over time.  Purchase price shall be calculated based upon an amortized table starting on April 1st, 2019 at a value of $914,760.00 and reduced by applying a variable interest rate of WSJ Prime plus a rate adjuster of +0.25% (with a minimum rate of no less than 5%) and amortized over 15 years.  Purchase price shall be equal to what would be considered the then current principle balance, as of the date of closing, if applying what would be the regularly paid calculated payments (principle and interest) using a standard loan calculation as if such payments had been made monthly.

Kustes emailed Duffield a "corrected amortization table showing correct calendar months and balances" after Duffield sent her a sample and asked how it compared to the contract language.

[10] Duffield attached the March 15 site plan rather than the March 28 preliminary plat.  Kustes failed to catch that the outdated plan was attached; this caused needless confusion later.

Plan," a copy of the March 12 drawing she sent Witter showing included nineteen outdoor courts, portable restrooms, and water rinse stations as "Exhibit B Lessor's Work," and a handwritten note on "Exhibit C Lessee's Work" stating she had "not received from Abode Construction." And she paid the $18,000 owed for the first year's rent.

As for the construction contract, it required Abode to "construct [] 19 outdoor sand volley ball courts, perimeter fencing, gravel parking, poured concrete entrance/vendor concessions area and sidewalks, tiki structures, final grading and landscaping as per Clients specifications (collectively "Facility") on the Property in substantial compliance with the Plans and Specifications described below and as provided by Client." The contract stated the plans were attached as exhibit A, but the attachment was the March 28 preliminary plat—not plans that detailed things like court placement, distance between volleyball poles, lighting needs, etc. Duffield was required to "pay Contractor the total Costs incurred in connection with construction of the Facility, including, for example, Costs incurred in connection with selections and changes under this Agreement, plus 10% (of total Costs) for Contractor's overhead and profit." And they were required to "make progress payments to Contractor for work completed to date on a bi-weekly basis as submitted by the Contractor within 10 days of application for payment." Despite Duffield and Witter each being aware that Duffield needed to find outside financing to complete the project, the contract stated:

> Owner will pay the Contract Price entirely from its personal funds and does not intend to obtain a construction loan. Owner warrants and represents that it has sufficient funds to pay the Contract Price without obtaining a construction loan. Prior to start of work by Contractor, Owner will provide Contractor evidence of its ability to

> pay the Contract Price. In addition, upon request by Contractor, at any time prior to final payment, it is entitled to reasonable evidence of Owner's continuing financial ability to fulfill its duties under this Agreement.

The construction contract required Duffield to provide a $10,000 deposit upon approval of the agreement. If the contractor materially breached the contract, the client could—after they gave the contractor written notice and ten days to cure—terminate the agreement in writing. In contrast, Abode had the right to "immediately terminate [the] Agreement with written notice to client" if Duffield failed to timely make any payment that was contractually required. It is unclear when Duffield signed the contract, as she did not date it, but she emailed the signed document to Kustes on April 26.

Even before both contracts were signed, Witter began expressing concern about Duffield's ability to pay for the work that had already been completed. There were a number of messages between Witter and Duffield concerning the pursuit of financing. Duffield often offered assurances that she was pursuing good leads.

During this same time period, Abode began sending Duffield construction bills. The first bill, dated April 27, was for $42,513.30. When Kustes sent Duffield a text on May 8 prompting her to pay the bill, Duffield objected that the bill from the electrician was incorrect. Kustes later responded that the bill was correct; though Duffield continued to argue that the electrician "doesn't have 15k in materials," she paid the full invoice the next day. Duffield continued to receive construction bills from Abode—approximately $200,000 worth—through August 2018. She never suggested the construction work should stop, and she never disputed any of the bills she received. She also never paid them.

The volleyball facility was up and running in some capacity in June. The planned nineteen courts were not completed—and, in fact, would never be completed—but photographs and social media posts show that several courts were open, and Duffield welcomed the public to the business as construction continued. There was neither sewer nor regular water service on the property, so customers used portable restrooms and cold-water rinse stations.

Around this same time, Abode announced it would not complete any more work without payment. Duffield was upset; she had events scheduled to take place and needed additional sand volleyball courts completed. Abode agreed it would move forward with completing ten courts if Duffield paid $10,000 towards the cost.[11] According to the email Kustes sent Duffield memorializing their conversation, the parties would "work towards a more permanent financing situation [once the ten courts were finished] and no further work will proceed without our mutual consent." Duffield paid the $10,000, and Abode completed the ten sand courts.

Duffield continued to operate the business throughout the 2018 season; the business's social media account posted photos of apparently successful events through mid-October.

On March 7, 2019, Duffield announced signups for the 2019 season on social media; she noted that the "[f]acility will be cleaned up and pristine from the winter soon." Duffield held league games, volleyball camps, and tournaments from

---

[11] According to Kustes's testimony, Duffield already owed Abode $154,034.88 at the time they made the $10,000 payment.

April to October. It is undisputed that they made no payments to Genesis for lease rent or for Abode on the outstanding construction bill in 2019.

In January 2020, Genesis sent Duffield two notices of non-payment of rent via certified mail. But after negotiations, Genesis and Duffield entered into an addendum to the lease agreement on March 19, 2020. According to Kustes's trial testimony, the goal was to give Duffield a chance to finalize financing to move the project forward and also cover her unpaid bills and to allow her to operate during the 2020 volleyball season to generate some income. According to the deposition testimony of Duffield's then-attorney, her objective—not disclosed to Genesis and Abode—was to buy some time to get her own appraisal in an attempt to re-negotiate the purchase price.

The addendum stated that "Lessee is currently in default pursuant to the Lease terms" and "Lessee alleges that Lessor is in default pursuant to the Lease terms due to its alleged failure to perform various obligations pursuant to the lease."[12] The parties agreed:

> Paragraph 5(B) of the Lease is deleted in its entirety, and in lieu thereof, the following Paragraph 5(B) is inserted: "Lessee shall be allowed to retain possession of the leased premises until 11:59 p.m. on October 10, 2020 upon the immediate payment of the sum of $25,000.00, which sum constitutes Lessee's total case rent obligation from the date of this Agreement to 11:59 p.m. on October 10, 2020, and full performance of all duties and obligations of Lessee set forth in this Lease. . . . Unless the parties subsequently agree otherwise in writing, said payment shall not be applied to any amounts owed by Lessee now or in the future, including but not limited to past due rents, other past due amounts,

---

[12] Despite the agreed-upon language stating Duffield was in default, paragraph 5 of the addendum stated that neither party "acknowledge[d], agree[d] to, or admit[ted] any claim the other party allegedly may possess against it or in any way waive or compromise any defenses thereto."

future rents, or other amounts which will be due or may become due pursuant to the Lease.

They also agreed that Duffield would "vacate the premises on or before October 10, 2020" without "notice or other action" from Genesis. And Genesis would not pursue remedies for default before October 11.

Duffield paid the $25,000 due under the addendum and, she operated the sand volleyball business in 2020. She advertised sign-ups in March 2020, and photos from the business's social media account show that events were held in at least May through October 2020.

On October 7—three days before the addendum required Duffield to vacate—her attorneys, sent a purchase offer to Genesis. Different from the offer to purchase, the new $330,000 offer included approximately 11.82 acres; including Lot 2 and two additional lots. In her trial testimony, Kustes explained that Genesis did not respond to the offer because it was "a ridiculous offer."

On October 10, the date to vacate under the addendum, Duffield was still operating the business on Lot 2 and advertising events in the coming days. So, in November, Genesis brought suit against Duffield, alleging breach of the sixteen-year commercial lease she entered into with Genesis in April 2018. Pointing to terms of the lease contract, Genesis also sought attorney fees. At the time, Duffield continued to occupy Lot 2; Genesis sought to have the lease terminated and Duffield ejected.

In response, Duffield requested an injunction prohibiting Genesis from removing them and repossessing the premises before a final judgment. She filed an "answer, affirmative defenses, counterclaims, and cross-petition." Duffield

denied failing to pay money owed pursuant to the lease and raised six affirmative defenses. Additionally, they brought counterclaims against Genesis, arguing Genesis failed to fulfill the lessor's obligations under the lease and it fraudulently induced them to enter the lease by making untrue representations that utilities would be provided to Lot 2 within the first year of the lease. Duffield also pointed to a provision in the lease that allowed them to purchase the premises; she asked the court to declare that the purchase price in the contract contemplated completion of all required improvements, such as bringing water and sewer to the property. Next, Duffield brought a cross-petition against LuxAir, Abode, Witter, and Kustes. She argued that (1) Abode "failed and refused to complete the promised construction," which was a breach of construction contract; (2) all of the named third-party defendants tortiously interfered with prospective business relationships. They later amended their pleadings to include a claim of unjust enrichment.

In a separate action, the district court—sitting in small claims court—granted Genesis's petition for forcible entry and detainer on Lot 2 (FED) in March 2021. Duffield appealed the FED ruling to the district court and then the Iowa Supreme Court. The Iowa Supreme Court denied discretionary review in July.

In October, the third-party defendant Abode brought a counterclaim against Duffield for breach of the construction agreement for failure to pay.

The case was tried to the bench over four days in April 2023. All of the principals involved in the contracting process testified as well as various experts with knowledge related to commercial real estate matters and the value of the property.

On June 8, 2024, the district court issued its eighty-five-page ruling, which contained extensive factual findings. The court noted that each party advanced dueling breach-of-contract claims against the other side, so the issue boiled down to who materially breached first. Genesis claimed Duffield breached the lease by becoming insolvent, failing to install nineteen complete sand volleyball courts, and by failing to pay rent. In response, Duffield claimed it was Genesis who breached first—by failing to provide sufficient water utilities or sewer services, failing to properly maintain the common areas, and failing to grant them quiet enjoyment of the property. After distilling all of the various breaches raised, the court concluded Duffield was in material breach of the lease in fall 2018 when she became insolvent. The court relied on the facts that Duffield failed to pay her debts as they came due from Abode as early as June 2018 even though she was not disputing the work product or that the invoices were accurate. Additionally, Duffield described her financial stress as of mid-2018, which included her failure to pay the Linn County Rural Electric Cooperative electrical billings as they came due, receiving a final disconnect notice in September 2018. The court rejected Genesis's argument that Duffield breached the lease by failing to construct *nineteen* sand volleyball courts. The court also found Duffield breached the lease by failing to pay rent, but that breach came in early 2020, after the expiration of ten days following the second notice of non-payment of rent..

Regarding Genesis's alleged breaches, the court concluded Genesis at least minimally complied with its obligations to proceed with the required subdivision and providing grading, a gravel road, and temporary electricity and water services. Genesis's one failure was failing to provide sewer services—

whether temporary or permanent—by April 1, 2019.  The district court concluded this was not a material breach, as the lease agreement required Duffield to give written notice of default and twenty days to cure, which she never did.  The court also concluded the failure to provide sewer would have become a material breach only if Genesis was given the chance to cure as contemplated by the contract and failed to do so.  Alternatively, the court found that even if Genesis's failure to provide sewer by April 1, 2019, was a material breach, it took place *after* Duffield materially breached the lease by becoming insolvent, so Genesis's noncompliance was excused.

Regarding the breach-of-construction-contract claims involving Abode and Duffield, the court concluded that she materially breached the contract while Abode did not, stating:

> Duffield agreed to pay Abode's costs plus 10% for the work she asked Abode to do; she failed to do so.  The Court finds that this was a *per se* material breach of the Contract, which sets forth specific remedies if a "client" fails to timely make payments "or otherwise materially breaches..." (Contract ¶24B).  Abode reasonably exercised its contractual and common law right to suspend further work because Duffield was not paying for what was done and could not pay for more work.  *See* Contract ¶24B and *Van Oort [Construction Co. v. Nuckoll's Concrete Service, Inc.]*, 599 N.W.2d [684,] 693 [(Iowa 1999)].
>
> Duffield alleges in her post-trial submission that Abode Construction breached the Construction contract "by failing to, and refusing to, complete portions of the promised construction."  It is undisputed that Abode built only ten of the nineteen volleyball courts required under the Contract.  However, the record is clear that Abode only stopped work on the courts *after* it became clear Duffield could not pay.  Even then, Witter continued construction beyond the point where Duffield stopped paying in order to ensure at least a substantial number of courts were complete and available for [her business's] use.
>
> With the work that *was* done, Duffield argued that it was not done in a workmanlike manner.  Her primary concern was with the quality of the concrete.  Duffield has worked in her mother's concrete

business and clearly has very high standards with respect to concrete. Overall, Duffield's construction defect claims are dubious at best. In any event, she clearly accepted and enjoyed the benefit of Abode's work without injury from any *alleged* quality problems because [the business] successfully operated and grew for three summer seasons. Abode's work satisfied AVP's exceptionally high facility standards during each of those three years, suggesting that none of Duffield's quality complaints were material even if true. Duffield also argued that Abode built her parking lot on property she was not even leasing. As discussed, this assertion was not proven, and could likely have been remedied by Genesis even if true.

Duffield claimed Genesis fraudulently induced her to enter the lease agreement, pointing to claims that Genesis never intended to provide sewer to Lot 2 by April 1, 2019, Genesis never intended to sell her Lot 2, and Witter misled Duffield into believing they were working together toward her dream. The district court ruled the claims failed because *Genesis* never made any pre-signing material representations about the lease—it was Kustes, acting as *LuxAir*'s representative, that made representations. Alternatively, the court rejected the claim because "every alleged representation that Duffield claims was fraudulently made to her was proven either to have never been made at all, or was true."

The district court also rejected Duffield's claim of unjust enrichment against Genesis, Abode, LuxAir, Witter, and Kustes. Duffield claimed that Genesis was unjustly enriched by keeping the rent payments ($18,000 for 2018 and $25,000 under the addendum in 2020). But she "had use of Lot 2 for three volleyball seasons." The $18,000 paid in 2018 was while the business was in operation and the $25,000 was paid as part of the 2020 addendum negotiations was far less than the lease contract required from April 1, 2019 until October 10, 2020. Thus, the court found nothing unjust about the rent Genesis kept for the three years the business operated. She also argued that Genesis was enriched by using the lease

agreement to obtain financing for its own large project, but the district court concluded that even if that assertion was factually correct, Duffield failed to show how the enrichment came at their expense—as required to prove the claim.

Regarding Duffield's claim of interference with prospective business advantage against Genesis, Abode, LuxAir, Witter, and Kustes, the court concluded:

> Duffield asserted that Abode *et al's* failure to comply with the Construction Contract interfered with Duffield's ability to meet her requirements under the Lease. Duffield further surmised that because her "fledgling business was destroyed by the actions of Genesis, Abode, LuxAir, Witter and Kustes," she was prevented from continuing to build business relationships "with patrons, athletes, parents, and sponsors." Given that Duffield materially breached *both* the Lease and Contract, there can be no improper interference with her business. Moreover, she offered <u>no</u> evidence that anyone declined to do business with her because of anything anyone other than she herself (and perhaps [her former business partner]) did. Duffield provided not a single witness on this issue, and her own testimony was vague, self-pitying, and largely lacking in credibility.
> Finally, Kustes designed these transactions to give Duffield one advantage after another so that she could succeed. Abode, Genesis, and LuxAir stood to lose considerable amounts of money if [the business] failed. It defies all logic to suggest that Kustes and Witter wanted to keep Duffield from paying rent, from paying Abode, and from making [her business] the flagship success at the gateway to Marion AirCom Park. As it turned out, Kustes and Witter continued giving Duffield the leeway she needed to continue doing business and succeed until they ran out of patience with her broken promises in October 2020.

Finally, the district court rejected each of Duffield's affirmative defenses.

The court awarded Abode $199,681.96 in damages for unpaid construction bills and accrued interest of $10,909.39. Applying its rationale that the "rent never got beyond the initial rate of $18,000 per year" (since the entitlements that were Genesis's responsibility were never delivered) and that the addendum terminated

the lease as of October 10, 2020, the court awarded Genesis only $28,215 for unpaid base rent and $24,573.74 for additional rent.

Duffield appeals.[13]

## II. Standard and Scope of Review.

"A breach-of-contract claim tried at law to the district court is reviewed by us for correction of errors at law." *NevadaCare, Inc. v. Dep't of Human Servs.*, 783 N.W.2d 459, 465 (Iowa 2010). The district court's "legal conclusions and application of legal principles" do not bind us. *Id.* (citation omitted). "We will reverse a district court's judgment if we find the court has applied erroneous rules of law, which materially affected its decision." *Id.* "In contrast, the district court's findings of fact are binding on us if they are supported by substantial evidence." *Id.* (noting the findings of fact have the "effect of a special verdict.").

## III. Discussion.

### A. Contract with Genesis (Lease Contract): Who committed a material breach first?

We start by recognizing the detailed work of the district court. While brevity is often a lofty goal, here the factual history was complicated and critical to the result. The factual findings, negative and positive for both sides, were set out in over fifty-one pages of the eighty-five page ruling with citations to portions of the record for support. That detail offers a clear picture into the parties' motivations and behavior. "The district court's findings of fact are binding on us if they are

---

[13] After Duffield appealed, the district court awarded Genesis, Abode, LuxAir, Witter, and Kustes attorney fees in the amount of $229,646.25 and costs in the amount of $9910.43. Duffield filed a notice of appeal and sought to consolidate, but our supreme court concluded the notice was untimely and dismissed it.

supported by substantial evidence." *Dolly Invs., LLC v. MMG Sioux City, LLC*, 984 N.W.2d 168, 173 (Iowa 2023) (cleaned up).

To that end, the district court concluded that both Genesis and Duffield breached the Lease contract, but it found that Duffield materially breached the contract first.[14] That material breach involved Duffield's failure to have financing and the wherewith all to fund and complete the project as the contract anticipated. In other words, Duffield was found to be insolvent, triggering the default provisions of the lease contract. And as Genesis argues "her breach absolved Genesis[] of its obligation to keep throwing good money after bad by providing sewer service to a tenant who did not need it and who obviously was unable to pay for the improvements that would need the sewer." *See Van Oort Constr. Co,* 599 N.W.2d at 693 (noting a party "was justified in suspending its performance under the contract until" the breaching party performed).

We start with applying principles of contract interpretation to determine the meaning of the words used in the lease contract. *Pillsbury Co. v. Wells Dairy, Inc.*, 752 N.W.2d 430, 435 (Iowa 2008). "Interpretation is the process for determining the meaning of the words used by the parties in a contract." *Id.; see Fashion Fabrics of Iowa, Inc. v. Retail Invs. Corp.,* 266 N.W.2d 22, 25 (Iowa 1978). This involves a legal issue. *Peak v. Adams*, 799 N.W.2d 535, 543 (Iowa 2011) ("Interpretation involves ascertaining the meaning of contractual words;

---

[14] The district court also concluded that Duffield materially breached the lease by failing to make the lease payments, but this breach did not take place until 2020—when Genesis followed the proper procedure to bill Duffield and then provide two default notices, to which Duffield did not make good. In the game of "who breached first," this late breach doesn't come into play.

construction refers to deciding their legal effect."). "Words and other conduct are interpreted in the light of all the circumstances, and if the principal purpose of the parties is ascertainable it is given great weight." *Fausel v. JRJ Enters., Inc.*, 603 N.W.2d 612, 618 (Iowa 1999) (quoting Restatement (Second) of Conts. § 202(1) (A.L.I. 1981)). One principle "of contract construction provides that while words are to be given their ordinary meaning, particular words and phrases in a contract are not to be interpreted in isolation." *See Iowa Fuel & Mins., Inc. v. Iowa State Bd. of Regents*, 471 N.W.2d 859, 863 (Iowa 1991).

The lease contract "deemed" that an "[e]vent of [d]efault" would include "[l]essee becoming *insolvent*, making a transfer in fraud of creditors or an assignment for the benefit of creditors and the assignment is not dismissed within 30 days. (emphasis added). Duffield argues this condition did not apply because this default event required proof of all of the listed conditions, not just insolvency. After reviewing the sentence structure, we disagree and find proof of any of the three conditions would constitute an event of default.

So, because the lease contract did not define the term "insolvent," we look to the ordinary meaning. In *Black's Law Dictionary* (12th ed. 2024) the term "insolvent" means "having liabilities that exceed the value of assets; having stopped paying debts in the ordinary course of business or being unable to pay them as they fall due." Duffield argues that the court's conclusion she became insolvent incorrectly considered the state of her finances in fall 2018, when her next payment to Genesis was not due until April 1, 2019. And in the order of who breached the lease contract first, Duffield asserts that Genesis' breach, relating to installation of the temporary sewer system, came into play on April 1, 2019, the

date in the contract that the sewer system had to be installed. As the court summarized:

> It is undisputed that Duffield failed to pay her debts to Abode as they came due, beginning with the Time & Materials Invoice dated June 6, 2018. Her failure to pay the debts was not due to any bona fide dispute with Abode; Duffield failed to dispute anything in that Invoice or any of the subsequent ones. Duffield repeatedly stated that she had only $250,000 total to complete the . . . project and that she would need to obtain financing or sponsors to pay for the remainder of it. She testified that she had spent her entire $250,000 cash by mid-2018 and was still attempting to obtain financing for the rest of the . . . project at that time. Duffield also failed to pay her debts to Linn County Rural Electric Cooperative ("REC") as they came due. She received a final disconnect notice on September 2, 2018, advising that her service would be disconnected if she did not pay $157.23 by September 25, 2018. On October 17, 2018, REC issued her a "Notice of Disconnection for a Returned Check Due to a Closed Account." The Notice advised her that, if payment of $230.43 in the form of cash or money order was not received by October 24, 2018, [her] service . . . would be disconnected on October 25, 2018. Again, her failure to pay these debts was not due to any bona fide dispute with REC. Duffield made no effort during the trial, or in her post-trial submissions, to refute that she was insolvent.

Evidence of Duffield's inability to secure financing was extensive and of her failure to pay her obligations in 2018 is clear. Before the lease contract was signed, Duffield alluded to Witter she had multiple sponsors "on board," that the Iowa Games were "already talking about us hosting for 2019," and that she had a great meeting with a bank. But as Witter, Kustes and Duffield spoke over text message often—about site progress, anticipated project costs, and how her pursuit of financing was going, tensions started to grow. On April 17, 2018, Witter asked Duffield, "How is the contract and financing coming along?" Duffield responded in part, "[F]inancing will be settled it sounds like tomorrow." Two days later, Witter reminded Duffield, "Need to get paper[work] done. Lease/Financing." On April 20, he sent, "Good morning. Are you able to finalize contract today?" On April 23,

Duffield sent Witter a message that she "[d]ropped of[f] checks."  The next day, Witter asked, "How's it going on the finance front[?]  A lot going on out here spending money wise n work getting done wise. I'm getting very nervous." Duffield responded with a positive outlook, stating, "It's going good—I have three banks that are supposed to let me know tomorrow or Thursday and I have a lunch Thursday with a friend who may consider putting in cash to use as more collateral." Over several messages, Witter responded,"

> I'm going ready to rock the rest of the road tomorrow.  About 35k. This rock is only needed for u this year [I] will pull it up and use under parking lot next year when paving gets done.  So I'm nervous. Should I pull off job[?]  Few days?  Did you get contract signed?  Can you assure me[?]  I'll try n hold off on rock one day.  Hate to stop momentum.  I'm rambling[15]

Duffield pushed Witter to continue the work, responded, "Yes and yes.  I'm doing the best I can, with the time I have.  I've spent 60k so far in, less in full, deposits, insurance and equipment, and have advertised all of this project already."  Witter responded that they were "both spending tons" and that he would "keep er rolling."

Over the next month, Witter continued to check in with Duffield about financing, asking at various times if Duffield would be getting a check to Kustes that day, if she had heard from the banker, and if she had any updates. On May 27, Witter asked her, "So we have financing?"  Duffield responded, "They are saying so."  Witter replied, "Well sorry to say we need more than them saying so.  We need form comm[itment]."  Duffield became defensive, responding, "Well I'm not happy feet are being dragged when my butt is on the line.  200k I'm in and it was

---

[15] This is not the order the messages appear in exhibit 2, but lining up the partial words that end and begin each message suggests it is the order Witter sent them.

known it was going to take time to get financing. This project is a month over time." Financing did not come and Duffield did not secure a construction loan to help fund the project. The inability to fund the project going forward evidenced by the growing number of unpaid billings in 2018 represents a material breach of the lease contract.

The district court found the factors related to proof of a material breach were satisfied by Duffield's insolvency breach. Those five factors are whether the breach: "(1) deprive[d] an injured party of a reasonably expected benefit; (2) cannot be adequately remedied; (3) produce[d] a forfeiture in the nonperforming party; (4) are not likely to be cured by the nonperforming party; and (5) result[ed] from the nonperforming party's failure to comply with standards of good faith and fair dealing." *See Dolly Investments, LLC,* 984 N.W.2d at 174. And the impact of that insolvency was aptly summarized by the court:

> Duffield's insolvency deprived Genesis both of a successful anchor tenant for the AirCom Park development and a direct stream of revenue under the Lease. Although Duffield tried repeatedly to gain financing and/or sponsors, she was unsuccessful. Absent a stroke of luck or a windfall in her lawsuit against [her former business partner], Duffield's insolvency was not likely to be cured. Genesis did not suffer a forfeiture as a result of Duffield's insolvency. Perhaps worst of all Duffield violated standards of good faith and fair dealing by repeatedly making false claims that financing was imminent in order to induce Kustes and Witter to delay terminating the Lease and evicting her.

As for the breach by Genesis, the district court did conclude that Genesis/LuxAir breached the lease contract by failing to deliver sewer service by April 1, 2019. But it determined this was not a material breach because the contract required Duffield to give Genesis a chance to cure the breach and she did not send the notice of default. Had Duffield provided contractually required written

notice of default with Genesis failing to cure the issue, the court noted that action would have constituted a material breach. But that was not the case as Duffield never provided a notice of default.[16] But timing was everything. Thus, we agree that even if the failure to provide sewer service by April 1, 2019, was a material breach, Duffield's material breach (becoming insolvent) occurred first, which excused Genesis/LuxAir's nonperformance. "It is a basic principle of contract law that once one party to a contract breaches the agreement, the other party is no longer obligated to continue performing his or her own contractual obligations." *Kelly v. Iowa Mut. Ins. Co.,* 620 N.W.2d 637, 641 (Iowa 2000) (citation omitted). And as Genesis argued, even if it was in breach, Duffield was not deprived of any actual benefit as she never constructed a building that would use sewer service[17] and her claims that she could not get financing without the sewer lines was unsupported by any evidence other than her self-serving testimony.

**B. Contract with Abode (Construction Contract): Who materially breached contract first?**

The district court concluded Duffield breached the contract with Abode when she failed to pay the construction invoices; and we find this was a material breach. Abode claims it stopped its work when it became clear Duffield could not perform under the contract terms. Under the contract, the failure to make any payment allowed Abode to "immediately terminate" the agreement after a written

---

[16] Genesis maintains that Duffield first raised the issue regarding lack of sewer services in 2020.

[17] Kustes credibly testified that "if we were to provide her with the temporary sewer, we can't appropriately size that without knowing what size of building, where the locations are at, any of the things. All of those things would cost her more money if we did it wrong in the first place."

termination notice was sent. Abode submitted multiple copies of notices of Duffield's nonpayment of the construction costs through email, text messaging and on the billing statements. And the court noted that Abode had substantially performed because Duffield opened the business by the contract deadline and continued operating it for three years, boasting that a national association, with extremely high standards for layout, construction and quality of sand volleyball courts, held events there from 2018 until 2020.

As for Duffield's claim that Abode materially breached the construction contract, the district court disagreed. Duffield maintains that Abode completed construction on land not leased by Duffield and charged her for construction items in violation of the contract; and that these actions pre-dated Duffield's failure to pay. She also listed several issues with the work done and the pricing, but the district court determined that "[t]he evidence showed that Abode did precisely the work [Duffield] asked Abode to do; [Duffield] just lost track of all of the expenditures and ultimately could not pay for it." On several points, the district court did not find Duffield's testimony to be credible. "[T]he credibility of witnesses is peculiarly the responsibility of the fact finder to assess." *Estate of Hagedorn ex rel. Hagedorn v. Peterson,* 690 N.W.2d 84, 88 (Iowa 2004).

We find that Duffield's failure to pay was a material breach of contract that allowed for immediate termination or cessation of work. *See Van Oort,* 599 N.W.2d at 693. And even if Duffield's claims that Abode violated the contract are accurate, which the district court rejected as not being supported of facts or the law, we do not find them to be material as either she didn't complain or when she did Abode

attempted to fix the issues. In sum, Duffield materially breached the Abode construction contract and the damages awarded were appropriate.

**C. Duffield's counterclaims.**

**1. Fraudulent Inducement.**

The district court rejected Duffield's claim of fraudulent inducement against Genesis, concluding statements by Kustes—while acting as *LuxAir's* representative—could not be fraudulent inducement by Genesis, which was the entity that Duffield made the claim against. To support its claim, Duffield argues Genesis inherited the statements/inducements made by Kustes as the contracting officer for LuxAir, the original lessor, through paragraph 19(B) of the lease contract. Duffield contends that Genesis had no intention of ever providing sewer to the property by April 1, 2019 or of ever wanting to sell the property to her.

The district court reached the merits of this claim and rejected all three of Duffield's theories of fraudulent inducement (that Genesis never intended to provide sewer services by April 1, 2019, that Genesis never intended to sell her the property, and that Witter was going to invest in the project). It concluded that "every alleged representation that Duffield claims was fraudulently made to her was proven either to have never been made at all, or was true." On appeal, Duffield only re-raises the claim that Genesis never intended to provide the sewer services in accordance with the contract. Thus, we only address the claim developed on appeal. As to the representations related to the sewer installation, the district court concluded this claim was without merit "Genesis was fully prepared to install sewer in the fall of 2018; Duffield's insolvency was the only reason sewer was delayed." We agree with the district court's conclusions.

First to show fraudulent inducement, Duffield had to prove by a preponderance of clear, satisfactory and convincing evidence eight elements:

> (1) [the] defendant made a representation to the plaintiff, (2) the representation was false, (3) the representation was material, (4) the defendant knew the representation was false, (5) the defendant intended to deceive the plaintiff, (6) the plaintiff acted in [justifiable] reliance on the truth of the representation . . . , (7) the representation was a proximate cause of [the] plaintiff's damages, and (8) the amount of damages.

*Spreitzer v. Hawkeye State Bank*, 779 N.W.2d 726, 735 (Iowa 2009) (citing *Gibson v. ITT Hartford Ins. Co.*, 621 N.W.2d 388, 400 (Iowa 2001)). Here narrowing the claim to that made on appeal—that Genesis never intended to provide a sewer service—there was sufficient evidence to show that Genesis ever made representations to Duffield it knew were false or intended to deceive her. First, the letter of intent noted that sewer service might be delayed due to timing and need to be on a temporary basis. The Lease provided that Genesis would provide "at minimum temporary sewer services" and the ability to provide permanent sewer services was hampered by city efforts to complete its end of the sewer service. And finally, the district court said that Witter "credibly" testified that had Duffield made the payments to Abode as required, Genesis would have installed the sewer improvement. And on this note, a trial court is in a "markedly better position to judge the credibility" of the witnesses than we can do from our vantage point. *Van Sloun v. Agans Bros., Inc.,* 778 N.W.2d 174, 182 (Iowa 2010).

Duffield failed to prove the elements of fraudulent inducement.

**2. Unjust Enrichment/Third-Party Unjust Enrichment.**

On appeal, Duffield claims unjust enrichment by Genesis who was "unjustly enriched by the payments made by Duffield, and by their leveraging of the non-

performing, unconscionable lease to gain a loan . . . of $8 million." The district court concluded those claims "ha[d] no support in fact." As our supreme court recently said:

> Unjust enrichment is a doctrine of restitution. It requires a plaintiff to prove the defendant received a benefit at the expense of the plaintiff under circumstances that make it unjust for the defendant to retain the benefit. The circumstances giving rise to an unjust enrichment cause of action might more appropriately be labeled "*unjustified enrichment*" seeing as our focus centers on whether there has been a "transfer of a benefit without adequate legal ground."

*Rilea v. State*, 959 N.W.2d 392, 393–94 (Iowa 2021) (internal citations omitted).

Regarding the lease contract, Duffield paid only partial rent, while operating a successful business on the property for three volleyball seasons. And while Genesis might have used the written lease agreement to obtain its own financing to complete other projects at the property, it is not clear how that was at Duffield's expense—a necessary element of unjust enrichment.

Duffield failed to prove a claim of unjust enrichment.

**D. Duffield's Affirmative Defenses**

**1. Breach of Good Faith and Fair Dealing.**

On appeal Duffield argues that Genesis was not operating in good faith with Duffield; as it never intended to provide sewer to the premises by the deadline. Genesis asserts that this argument was never ruled on by the district court; so it is not preserved for our review. We agree. A brief mention of the term good faith in the ruling is not sufficient to establish that the district court ruled on that theory of recovery. "It is a fundamental doctrine of appellate review that issues must ordinarily be both raised and decided by the district court before we will decide them on appeal." *Meier v. Senecaut*, 641 N.W.2d 532, 537 (Iowa 2002).

**2. Impossibility/Impracticability**

Here, Duffield asserts that she could not get financing because the sewer system was not installed by April 2019. She argues it was impossible for her to perform her contractual obligations, but it's not clear what obligation(s) she means. Presumably she means she could not pay her bills because she could not obtain outside financing without the sewer installed. But the district court's factual findings established that it was Duffield's own past financial problems and business reputation[18] that prevented banks from giving her any funding; which was contrasted with evidence that banks do provide financing to people to start projects even when no development has been done. And her inability to obtain financing was foreseeable for all the same reasons she ultimately was unsuccessful in getting the loans; even one of her own attorneys warned her she couldn't fund the project and advised against entering the contracts. Likewise, Duffield presented no evidence from any banker supporting her theme that the reasons for her lack of financing were as she stated.

Under the contract impossibility of performance theory, Duffield had to show "there were extraordinary circumstances which: (1) prevent a person from carrying out the terms of the contract; (2) cannot reasonably have been anticipated; and (3) are not the fault of that party." 8A Tom Riley & Peter C. Riley, *Iowa Practice Series: Civil Litigation Handbook* § 45:11 (Aug. 2025 update); *see Associated Grocers of Iowa Co-op., Inc. v. West*, 297 N.W.2d 103, 108 (Iowa 1980) ("Nothing renders this contract impractical or impossible except [defendant's] bad

---

[18] Duffield testified that her business partner in the earlier volleyball enterprise was discrediting her reputation throughout the community.

judgment."). As it turned out, the circumstances were that Duffield could not leverage her volleyball expertise to gain financing and thus entered an arrangement she was unable to sustain. Duffield failed to establish the elements of this affirmative defense.

### 3. Unconscionability

Duffield attacked both the construction contract and lease contract under this theory. "A contract is unconscionable where no person in his or her right senses would make it on the one hand, and no honest and fair person would accept it on the other hand." *Bartlett Grain Co. v. Sheeder,* 829 N.W.2d 18, 27 (Iowa 2013) (citation omitted). And as the district court noted an unconscionability defense cannot "rescue a party from an imprudent bargain or buyer's remorse." *Homeland Energy Solutions, LLC v. Retterath,* 938 N.W.2d 664, 704 (Iowa 2020).

On this claim, Duffield points to the district court's finding that the increase in rent to $85,000 for the remaining sixteen years of the lease contract was unconscionable until the entitlements, including the sewer installation, were provided. In response, Genesis argued the lease rent was $18,000 the first year and $85,000 the second, regardless of whether it delivered on its obligation to provide water and sewer services by the start of the second year, and that was how Genesis calculated its damages. Yet, the district court found that applying the lease terms as Genesis argued—charging the increase in rent without the entitlements— was "[not] sufficient to deem the Lease unenforceable" because the court further concluded that the rent increase would not apply until the entitlements were provided. In other words, the court did not enforce that increase to $85,000 but instead found that the lease rent should remain at $18,000 per year. But

Duffield argues the increase in rent from year 1 to year 2 is substantively unconscionable and the court should not enforce the entire lease contract. "Substantive unconscionability includes harsh, oppressive, and one-sided terms." *R.J. Meyers Co. v. Reinke Mfg. Co.*, 885 N.W.2d 429, 439 (Iowa Ct. App. 2016) (cleaned up).

But even with the district court's modification of the rent terms, we do not see how the actual terms of the lease make it unconscionable. The unconscionability of a contract or clause is "determined at the time it was entered." *C & J Vantage Leasing Co. v. Wolfe*, 795 N.W.2d 65, 80–81 (Iowa 2011) (examining factors of "assent, unfair surprise, notice, disparity of bargaining power, and substantive unfairness" in determining if a contract is unconscionable). Here, Duffield had the opportunity to have counsel review the lease contract, had experience in the construction industry and had already involved herself in another buildup of a volleyball enterprise. The application of the clause in the lease contract may have seemed unfair in the end, but the doctrine of unconscionability cannot operate here to save Duffield from what she now perceives is a bad bargain. *Id.* at 81 (holding there was no procedural unconscionability or substantive unconscionability when an intelligent business entity had an opportunity to read the agreement, no unequal bargaining power existed, and contract was not overly oppressive).

Under the construction contract, Duffield argues it was hard to understand and inadequately defined.[19] "[P]rocedural unconscionability includes the existence of factors such as sharp practices, the use of fine print and convoluted language, as well as a lack of understanding and inequality of bargaining power.'" *R.J. Meyers Co.*, 885 N.W.2d at 439 (cleaned up)*.* But at the end of the day, the doctrine of unconscionability does not rescue people from bad bargains and we, as a reviewing court, cannot either. *See Homeland Energy Solutions*, 938 N.W.2d at 704. Duffield had the opportunity to have the contracts reviewed by counsel, was told by one attorney not to move forward and despite that, many of the terms were favorable to Duffield.

In sum, Duffield failed to show that either of the contracts were unconscionable.

**4. Indefinite Construction Contract**

Finally, Duffield argues that the contract with Abode contained ambiguous terms that exposed her to "multimillion dollar liability, with no scope of work, no building plans, no budget, no financing, no timeline and [made her a tenant that] 'was on the hook.'" She asserts the vagueness of these terms makes the contract unenforceable. *See Gildea v. Kapenis*, 402 N.W.2d 457, 459 (Iowa Ct. App. 1987) ("Vagueness of expression, indefiniteness, or uncertainty as to any of the essential terms of the agreement may prevent the creation of an enforceable contract."). Her argument sounds like someone who soured on the deal she made. Even so,

---

[19] All parties acknowledge that the contract was generated from a template that references shopping centers and had language that did not expressly apply to this particular buildout, but those terms are not part of this claim.

as the district court pointed out, the construction contract, based on a time and materials clause, allowed Duffield to request quotes and then accept or reject them at every step or do the work herself or with other contractors. She also testified to her expertise and knowledge related to the building trades and thus, we do not find she met her burden to show the contract was too ambiguous to enforce.

## IV. Conclusion.

For the reasons outlined above, we affirm the ruling of the district court.

**AFFIRMED.**